# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:18-cv-00292-MR-WCM

| | |
|---|---|
| **SARA E. WILLIS,** )<br><br>**Plaintiff,** )<br><br>**vs.** )<br><br>**CLEVELAND COUNTY, NORTH** )<br>**CAROLINA,** *sub nom.* **CLEVELAND** )<br>**COUNTY PUBLIC HEALTH** )<br>**DEPARTMENT/ANIMAL CONTROL** )<br>**SERVICES DIVISION; BRIAN EPLEY,** )<br>in his official capacity as the )<br>Manager of Cleveland County**;** )<br>**DOROTHEA WYANT,** individually )<br>and in her official capacity as )<br>"Health Director" of the Cleveland )<br>County Health Department**; SAM** )<br>**LOCKRIDGE,** individually and in )<br>his official capacity as the former )<br>Cleveland County General Services )<br>Director and Supervisor of the )<br>Cleveland County Animal Control )<br>Division**,** )<br><br>**Defendants.** )<br>_____ ) | **MEMORANDUM AND**<br>**DECISION OF ORDER** |

**THIS MATTER** is before the Court on the County Defendants' Motion for Summary Judgment. [Doc. 45].

# I. BACKGROUND

On October 17, 2018, Sara E. Willis (the "Plaintiff") filed a Complaint against Cleveland County (the "County"), Brian Epley ("Epley"), Dorothea Wyant ("Wyant"), and Sam Lockridge ("Lockridge"), asserting several claims for violations of her civil rights. [Doc. 1 at 21-54]. Specifically, the Plaintiff asserts claims for violations of 42 U.S.C. § 2000e et seq. ("Title VII"); 29 U.S.C. § 206 ("Equal Pay Act"); 42 U.S.C. §§ 1983 and 1985 ("Section 1983" and "Section 1985"); N.C. Gen. Stat. § 95-25.1 et seq. (the "North Carolina Wage and Hour Act"); common law claims for negligent hiring, training, supervision, and retention, negligent and intentional infliction of emotional distress, wrongful discharge in violation of public policy, loss of consortium; claims for punitive damages; and a request for declaratory relief. [Id.]. The Plaintiff's husband, Brian Willis, also asserted claims. [Id.]. Mr. Willis, however, voluntarily dismissed his claims without prejudice in August 2019 and is therefore no longer a party to this case. [Doc. 26].

On January 7, 2019, the County Defendants filed their Answer, asserting several affirmative defenses. [Doc. 15].[1] On January 28, 2020, the County Defendants moved for summary judgment on the Plaintiff's

---

[1] On January 28, 2020, the County Defendants requested leave to amend their Answer to add another affirmative defense. [Doc. 43]. The Court granted that motion [Doc. 59] and the County Defendants filed a "First Amended Answer" on March 3, 2020. [Doc. 65].

claims. [Doc. 45]. The Plaintiff responded to the County Defendants' motion on February 27, 2020 [Doc. 61].[2] The County Defendants have replied. [Doc. 63].[3]

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "As the Supreme Court has observed, 'this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

---

[2] The Plaintiff originally filed a responsive brief that was not formatted in compliance with the Court's rules, [Doc. 51], along with a motion requesting additional pages to respond to the County Defendants' Motion for Summary Judgment. [Doc. 52]. The Court denied that motion and ordered the Plaintiff to file a brief that complied with the Court's page limit and formatting rules. [Doc. 58]. The Plaintiff responded by filing a new brief that still did not comply with the Court's page limit and formatting rules. [Doc. 61]. The Court then entered a Show Cause Order against the Plaintiff. [Doc. 62]. The Plaintiff responded by filing a brief that complied with the Court's rules. [Doc. 67-1]. The Court treats that brief as the Plaintiff's response to the County Defendants' Motion for Summary Judgment.

[3] Defendant Lockridge remains a party to this action but does not join the County Defendants' Motion for Summary Judgment and has not filed a separate one.

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party.  Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).  "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact."  Bouchat, 346 F.3d at 522.  If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist.  Id.

In considering the facts on a motion for summary judgment, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party.  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986).

## III.    FACTUAL BACKGROUND[4]

During the period relevant to this Complaint, Defendant Epley served as the Manager of Cleveland County, Defendant Wyant served as the Health Director of the Cleveland County Health Department, and Defendant Lockridge was employed as the Cleveland County General Services Director

---

[4] "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party."  Scott v. Harris, 550 U.S. 372, 380 (2007).  This summary of facts is presented for the analysis of the County Defendants' motion for summary judgment, so the facts are viewed in the light most favorable to the Plaintiff.

4

and Supervisor of the Cleveland County Control Services Department. [Doc. 61-27: Deposition of Plaintiff Sara Willis ("Pl. First Dep.") at 37, 143-45, 220]. Defendant Lockridge reported to Defendant Wyant, who reported to Defendant Epley, who reported to the Cleveland County Commissioners. [Doc. 65: Def.'s Am. Answer at 10].

Defendant Lockridge worked for Cleveland County from 1990 to 2017. [Doc. 61-5: Deposition of Defendant Lockridge ("Lockridge Dep.") at 185]. He started as a recycling coordinator in the Solid Waste Department in 1990. [Id. at 32-35; Doc. 61-6]. In 1994, the Cleveland County Health Director issued a "final written warning" to Defendant Lockridge after he failed to follow a direct order prohibiting him from contacting a female subordinate who had asked to be transferred from under his supervision. [Doc. 61-23].

In 1995, Defendant Lockridge was promoted to supervise the Cleveland County Animal Control Department and the Cleveland County Solid Waste Department. [Doc. 61-5: Lockridge Dep. at 38-44]. In those positions, Defendant Lockridge had the power to hire employees. [Id. at 164-65].

On May 1, 2016, Defendant Lockridge hired the Plaintiff to work at the Cleveland County Animal Control Division's animal shelter as a "Labor Crew Leader – Euthanasia Tech." [Doc. 61-27: Pl. First Dep. at 26, 149]. The

Plaintiff 's husband was also employed by Cleveland County and supervised by Defendant Lockridge during that time. [Doc. 61-28: Second Deposition of Plaintiff Sara Willis ("Pl. Second Dep.") at 81, 225]. Shortly after the Plaintiff was hired, Defendant Lockridge slapped her on the buttocks while the two were leaving a meeting in his office. [Doc. 61-27: Pl. First Dep. at 91, 105-06; Doc. 61-28: Pl. Second Dep. at 219;]. The Plaintiff turned around, saw Defendant Lockridge smiling at her, and walked out of his office. [Doc. 61-27: Pl. First Dep. at 123; Doc. 61-20 at 2].

A few months later, in December 2016, Defendant Lockridge called the Plaintiff to his office to discuss her applying for a promotion to "community cat diversion coordinator." [Doc. 61-27: Pl. First Dep. at 124-25]. While the promotion would have entailed a pay raise for the Plaintiff, she first would have taken a slight pay cut because she would have to pay taxes on the county vehicle that she would receive. [Id. at 195-96]. During the meeting to discuss the promotion, Defendant Lockridge told the Plaintiff that he wanted her to take the position and promised to give her the position if she applied. [Id. at 124-25, 192-93]. The Plaintiff filled out the application for the position during that meeting. [Id. at 124-25]. After the paperwork was done, Defendant Lockridge reached over to the Plaintiff and touched her inner thigh with his hand. [Id.]. The Plaintiff immediately moved away from Defendant

6

Lockridge and left his office. [Id.]. The Plaintiff never received the promotion to the community cat diversion coordinator position or an explanation for why she did not get the promotion. [Id. at 192].

During the course of the Plaintiff's employment, Defendant Lockridge tried to kiss the Plaintiff on the face or mouth approximately 20 times. [Id. at 90, 122]. The Plaintiff always avoided Defendant Lockridge's kisses by turning her head. [Id. at 122]. Defendant Lockridge also hugged the Plaintiff, touched the Plaintiff inappropriately, and made inappropriate remarks to the Plaintiff on several occasions. [Id. at 88; Doc. 61-4: Affidavit of Zac Lovelace ("Lovelace Aff.") at ¶ 8]. The Plaintiff abruptly left several meetings after Defendant Lockridge made inappropriate comments to her. [Id.].

Zac Lovelace ("Lovelace") worked as an enforcement officer in the Animal Control Department from 2011 to 2017. [Doc. 61-4: Lovelace Aff. at ¶ 2]. Lovelace was one of the Plaintiff's supervisors and was supervised by Defendant Lockridge. [Id. at ¶¶ 3-5]. Lovelace states that he "personally observed Mr. Lockridge act inappropriately towards Mrs. Willis through his words and his conduct." [Id. at ¶ 7]. Specifically, Lovelace remembers "three or four occasions when Sam Lockridge made inappropriate remarks to Mrs. Willis of a personal nature regarding her sex (female); he would hug her, kiss her on the cheek, rub her backside as he let his hand fall down the small of

her back onto her rear-end." [Id. at ¶¶ 8, 10]. Lovelace states that the Plaintiff would "attempt to avoid such physical contact by moving away from Sam Lockridge or turning her head to the side when he went to kiss her." [Id.].

Other employees witnessed Defendant Lockridge engaging in similar conduct. Patti Bracken ("Bracken") worked as a rescue coordinator at the Animal Control Department and under Defendant Lockridge's supervision from 2015 to 2017. [Doc. 61-1: Deposition of Patti Bracken ("Bracken Dep.") at ¶ 5]. In 2016, Bracken states that Defendant Lockridge stroked her arm when she showed him a piece of paper during a meeting in his office. [Id. at ¶ 24]. Bracken states that Defendant Lockridge "must have noticed my repulsion and asked if that was 'OK,' and [she] immediately said, 'No it's not,' and sat back down." [Id.]. Bracken states that the way he touched her was "highly inappropriate" and that she "immediately made it clear to him (by my reaction and my words) that as a subordinate female employee, such behavior was not acceptable." [Id.]. Bracken further states that after she "rebuffed his physical attentions," Defendant Lockridge "immediately began to 'grill'" her about her work, berated her "to the point of tears" and told her to "just get over" her mother's death. [Id. at ¶ 25]. Bracken states that "it is

clear that Sam Lockridge's berating me . . . was the direct result of my having rebuffed his personal attentions and physical contact." [Id.].

Bracken further states that "many times at employee lunches, Sam Lockridge would come up behind younger female employees and begin to rub their backs" and that she "observed the negative reactions on the faces of these women." [Id. at ¶ 33]. Bracken also states that Defendant Lockridge could be seen "kissing, hugging, and expressing 'over the top' affection to many women in the County[,]" including "at public functions, office gatherings, County Commissioners meetings, and health fairs." [Id.]. Specifically, Bracken recalls attending a public event with Marguerite Mebane, the President of the Humane Society of Cleveland County. [Id. at ¶ 28]. At the event, Defendant Lockridge was "was very attentive" towards Mebane and "made physical contact with [Mebane], rubbing her hand." [Id.]. Mebane "pulled away and was visibly uncomfortable." [Id.].[5]

Lovelace also saw Defendant Lockridge engaging in inappropriate behavior with other women beyond the Plaintiff. Lovelace states that "just

---

[5] Bracken states that Defendant Lockridge previously had "come on to [Mebane] very strong" and that Mebane said she told Defendant Wyant about Defendant Lockridge's advances because they made her uncomfortable. [Id.]. Bracken's statement, however, is hearsay. "[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." Md. Highways Contractors Ass'n, Inc. v. Maryland, 933 F.2d 1246, 1251-52 (4th Cir. 1991). Because the Plaintiff offers no basis for the admissibility of Bracken's statement, the Court will not consider it for the purposes of the County Defendants' Motion for Summary Judgment.

about every woman who worked with Mr. Lockridge appeared to have had some type of interaction in the nature of inappropriate comments, physical contact," or other inappropriate behavior. [Doc. 61-4: Lovelace Aff. at ¶ 9]. Lovelace states that while he only worked with Defendant Lockridge since 2011, he "had the impression" that Defendant Lockridge engaged in inappropriate sexual behavior with "just about every woman that worked closely with" him "going back to the 1990's." [Id.]. Lovelace states that Defendant "Lockridge had done the same thing with countless women, and basically with everybody that had been in the position that [the Plaintiff] held" since that position was created in 2013. [Id. at ¶ 15].

Rebecca Sitzes ("Sitzes") worked for the Cleveland County Animal Control Department in 2017 and also saw Defendant Lockridge engaging in inappropriate behavior with females. [Doc. 61-25: Deposition of Rebecca Sitzes ("Sitzes Dep.") at 17-18]. Sitzes states that Defendant Lockridge was "one of those people that is constantly trying to touch you, like put his hand on your arm." [Id. at 41]. Sitzes states that Defendant Lockridge's touches were "not welcome" and that while she "never directly spoke out against it," she "definitely didn't encourage it." [Id. at 45]. Sitzes also states that Defendant Lockridge would call employees pet names like "honey," "baby

girl," "dear," and "sweetie." [Id.]. Sitzes states that Defendant Lockridge only acted that way with female employees. [Id. at 43].

Jacqueline Harrison ("Harrison"), a local resident who "keeps an eye on the personnel and practices employed at the Cleveland County Animal Shelter[,]" states that she observed Defendant Lockridge engaging in similar conduct. [Doc. 61-3: Affidavit of Jacqueline Harrison ("Harrison Aff.") at ¶ 3]. Harrison states that she has "observed many inappropriate personal interactions between Lockridge and females in Cleveland County," particularly "greeting female subordinates, colleagues, and other women with a hug and kiss around the Cleveland County Animal Shelter or shelter sponsored events, and at County Commissioners Meetings." [Id. at ¶¶ 8; 10]. She further states that she has seen "many, many women, turning away from his embrace or turning their heads to deflect his kisses, rolling their eyes, looking the other way to avoid his gaze, or turning and walking away, obviously to avoid encountering Sam Lockridge altogether." [Id.].

While many people claim that they were aware of Defendant Lockridge's behavior, none of them reported it. Bracken states that "the women in the office all talked about Sam Lockridge's inappropriate behavior, but no one would complain" about his behavior because they "were afraid to report it." [Doc. 61-1: Bracken Aff. at ¶ 34]. Bracken further states that

11

employees feared Defendant Lockridge because he was close to Defendant Wyant and other County officials and "would wield his substantial power to punish anyone who spoke out against him." [Id at ¶ 33]. Lovelace also states that it was "general knowledge" within the Animal Control Department that Defendant Lockridge was "untouchable" because he "had close personal ties or strong connections with people in high places in the Cleveland County government," and had a "close personal relationship outside of the workplace" with Defendant Wyant. [Doc. 61-4: Lovelace Aff. at ¶ 11].

At the end of May 2017, the Plaintiff reported Defendant Lockridge's sexual harassment for the first time to Lovelace. [Id. at ¶ 15]. Lovelace states that he told the Plaintiff he had observed Defendant Lockridge's inappropriate behavior and that "other female employees had all dealt with the same types of behavior from Sam Lockridge." [Id.]. When the Plaintiff told Lovelace that she intended to report Defendant Lockridge's behavior, he responded that "filing a complaint of sexual harassment against Sam Lockridge was probably not going to work in Cleveland County" and that if she was filing a complaint she should "make sure she had another job." [Id. at ¶ 16]. Lovelace told the Plaintiff that she "needed some kind of hard proof before reporting Sam Lockridge and suggested that she could record Sam Lockridge making his usual improper comments." [Id.]. Lovelace states that

even though he was the Plaintiff's supervisor, he never reported the Plaintiff's complaints about Defendant Lockridge because he "knew how that would have gone: I would have called HR and tried to set up a meeting, and when I walked in, Sam Lockridge would have been in there, and my job would have been in trouble, instead of Sam Lockridge" and he "was trying to watch out for [his] own position at that point." [Id. at ¶ 17].

On May 30, 2017, the Plaintiff went to Defendant Lockridge's office to submit her letter of resignation. [Doc. 61-28: Pl. Second Dep. at 121]. The Plaintiff secretly recorded that meeting in order to get proof of Defendant Lockridge's sexual harassment. [Doc. 61-20]. Almost immediately, the recording captures Defendant Lockridge telling the Plaintiff to "give me a kiss" and "give me a hug." [Id. at 3-5]. Defendant Lockridge also tried to kiss the Plaintiff during the meeting. [Doc. 61-27: Pl. First. Dep. at 120-21]. When Defendant Lockridge tried to kiss her, the Plaintiff turned her head and left. [Doc. 61-20 at 12].

Shortly after that meeting, Defendant Lockridge told Lovelace and Sitzes that he would fire the Plaintiff's husband if she did not "behave" or keep her "mouth shut." [Doc. 61-4: Lovelace Aff. at 8; Doc. 61-25: Sitzes Dep. at 91]. Lovelace and Sitzes both relayed those threats to the Plaintiff. [Doc. 61-4: Lovelace Aff. at ¶ 20; Doc. 61-16 at 3; Doc. 61-27: Pl. First Dep.

at 128-29; Doc. 61-28: Pl. Second Dep. at 224]. The Plaintiff's exit interview with the Cleveland County Human Resources Department had been scheduled for June 14, 2017. [Doc. 61-27: Pl. First Dep. at 140-141]. After she heard about Defendant Lockridge's threats towards her husband, the Plaintiff asked to have her exit interview with the Cleveland County Human Resources Department moved up. [Doc. 61-28: Pl. Second Dep. at 227; Doc. 61-13: Deposition of Alison Mauney ("Mauney Dep.") at 29]. The Human Resources Department granted her request and rescheduled her exit interview. [Id.].

During her exit interview on June 1, 2017, the Plaintiff reported Defendant Lockridge's harassment for the first time to Allison Mauney ("Mauney"), the Cleveland County Director of Human Resources, and Stephanie Freeland, a Human Resources Department Assistant. [Doc. 61-2: Affidavit of Stephanie Freeland ("Freeland Aff.") at 2; Doc. 61-13: Mauney Dep. at 72-73; Doc. 61-20; Doc. 61-27: Pl. First Dep. at 149]. The Plaintiff also played the recording of her meeting with Defendant Lockridge for Mauney. [Id.]. After hearing the Plaintiff's complaints, Mauney told the Plaintiff to take sick days until the County completed its investigation into her allegations against Defendant Lockridge. [Doc. 61-2: Freeland Aff. at 144-45].

On June 5, 2017, a meeting was held between Defendant Lockridge, Defendant Wyant, Mauney, and the Cleveland County Attorney. [Doc. 61-19: Deposition of Dorothea Wyant ("Wyant Dep.") at 225; Doc. 61-13: Mauney Dep. at 291-92; Doc. 61-10]. During that meeting, Defendant Lockridge was formally placed on administrative leave and told that an investigation was underway regarding sexual harassment complaints against him. [Id.].

The next day, Defendant Lockridge called Defendant Wyant to ask if he could retain his benefits by retiring early. [Doc. 61-5: Lockridge Dep. at 298; Doc. 61-13: Mauney Dep. at 267-68]. Mauney responded that it was possible if Defendant Lockridge sent her a letter of resignation by the end of the day. [Doc. 61-13: Mauney Dep. at 267-68]. On June 7, 2017, Defendant Lockridge submitted his letter of resignation stating that he intended to retire on June 30, 2017. [Doc. 61-9].

Despite Defendant Lockridge's stated intent to retire, the County's investigation continued and determined that Defendant Lockridge needed to be terminated. [Doc. 61-19: Wyant Dep. at 267]. On June 14, 2017, Defendant Lockridge received a letter stating that a "pre-dismissal conference" would be held on June 16, 2017 because he engaged in "unacceptable personal conduct" including "unlawful workplace harassment

that created a hostile work environment." [Id.; Doc. 61-11]. On June 15, 2017, Defendant Lockridge submitted a second letter of resignation stating that he was retiring immediately instead of on June 30, 2017. [Doc. 61-12]. The County accepted Defendant Lockridge's retirement and allowed him to keep his retirement benefits. [Doc. 61-19: Wyant Dep. at 271; Doc. 61-13: Mauney Dep. at 298; Doc. 61-18].

The Plaintiff ended her employment with Cleveland County on June 15, 2017. [Doc. 61-27: Pl. First Dep. at 26, 31, 173-74].

## IV. DISCUSSION[6]

### A. Title VII Claims

#### 1. Title VII Claims against Defendants Epley and Wyant

The Plaintiff brings Title VII claims against Defendant Epley and Defendant Wyant their official capacities and Defendant Wyant in her individual capacity. [Doc. 1].

Lawsuits against government employees in their official capacities are "only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165–66 (1985). "Thus, in

---

[6] The Plaintiff's Complaint is not a model of clarity. For several claims, the Plaintiff makes allegations against the "Defendants (specifically including the Defendant Cleveland County)" but then requests relief only in the form of "a judgment against Cleveland County[.]" [Doc. 1 at ¶ 132 (NCWHA claim); ¶ 140 (negligent hiring, training, supervision, and retention claim); ¶ 170 (punitive damages claim)]. For the sake of thoroughness, the Court will analyze those claims as if they are brought against all of the County Defendants.

Case 1:18-cv-00292-MR-WCM   Document 71   Filed 07/01/20   Page 16 of 56

official-capacity suits, the 'real party in interest' is not the named official, but the entity that employs him; and the damages sought to be recovered will not come from the pockets of the named official, but rather from the treasury of the entity that employs him." Johnson v. North Carolina, 905 F. Supp. 2d 712, 721 (W.D.N.C. 2012).  As such, Title VII claims brought against employees in their official capacities are redundant and subject to dismissal when such claims are based on the same conduct and brought in the same suit as Title VII claims against the employer.  Id.; Sheaffer v. County of Chatham, 337 F. Supp. 2d 709, 721 (M.D.N.C. 2004); Haynes v. Williams, 88 F.3d 898, 899 (10th Cir. 1996).  Because the Plaintiff makes Title VII claims against the County, [Doc. 1], the claims against Defendants Epley and Wyant will be dismissed as redundant.  Accordingly, County Defendants' Motion for Summary Judgment regarding the Plaintiff's Title VII claims against Defendants Wyant and Epley in their official capacities will be granted.

The Plaintiff also brings Title VII claims against Defendant Wyant in her individual capacity.  [Doc. 1].  Supervisors, however, "are not liable in their individual capacities for Title VII violations."  Lissau v. S. Food Serv., Inc., 159 F.3d 177, 181 (4th Cir. 1998).  Instead, employers are solely liable for Title VII violations.  Id.  As such, Defendant Wyant's motion for summary

judgment on the Plaintiff's Title VII claims against her in her individual capacity will be granted.

### 2. Title VII Claims against the County

With the dismissal of the Plaintiff's Title VII claims against Defendants Wyant and Epley, the Court turns to address the County Defendants' Motion for Summary Judgment on the Plaintiff's claims against the County for hostile work environment, unlawful retaliation, and intentional acts of direct discrimination/disparate treatment. [Doc. 1 at 21-33]. Although claims based on hostile work environment, unlawful retaliation, and disparate treatment "are all claims of gender discrimination, they are distinct causes of action governed by different analytical standards." Desouza v. Office of Children & Family Servs., No. 18CV2463PKCSMG, 2019 WL 2477796, at *4 (E.D.N.Y. 2019). "The differing analytical standards governing each theory of gender discrimination mean that allegations sufficient to establish one claim, e.g., disparate treatment, do not necessarily support an action based on another claim, e.g., hostile work environment." Id.

### a. Hostile Work Environment

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–

2(a)(1).  Because "an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." EEOC v. R&R Ventures, 244 F.3d 334, 338 (4th Cir. 2001).  To establish a hostile work environment based on sexual harassment, a plaintiff-employee must prove that (1) the conduct was unwelcome; (2) it was based on the plaintiff's sex; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer.  Spicer v. Commonwealth of Va., Dep't of Corr., 66 F.3d 705, 709–10 (4th Cir. 1995) (en banc) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993)).  If the plaintiff brings a hostile work environment claim against her employer based on her supervisor's actions, "the employer is subject to vicarious liability where the harassment culminated in a tangible employment action." Crockett v. Mission Hosp., Inc., 717 F.3d 348, 354 (4th Cir. 2013) (citing Whitten v. Fred's, Inc., 601 F.3d 231, 243 (4th Cir. 2010)).  "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

If "no tangible employment action [was] taken, a defending employer may raise [the Faragher-Ellerth] affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). The Faragher-Ellerth affirmative defense shields an employer from liability if it can prove by a preponderance of the evidence (1) that the employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S. at 765. If an adverse employment action was taken, however, the employer cannot assert the Faragher-Ellerth defense. Collins v. Chem. Coatings, Inc., No. 5:07CV116, 2010 WL 1404619, at *5 (W.D.N.C. Mar. 31, 2010).

The Plaintiff asserts that Defendant Lockridge's actions subjected her to a hostile work environment. She further claims that the liability can be imputed to the County as her employer because Defendant Lockridge took a tangible employment action by failing to promote her to the "community cat diversion coordinator" position. [Doc. 67-1 at 10].

The County does not dispute that the Plaintiff was subject to unwelcome conduct based on her sex that was sufficiently severe or

pervasive to alter her conditions of employment and create an abusive work environment.  See Ray v. Int'l Paper Co., 909 F.3d 661, 667 (4th Cir. 2018); Spicer, 66 F.3d at 709–10.  Instead, the County argues that no tangible employment action occurred here because tangible employment actions typically include economic harm and the Plaintiff would have earned less money if she had been promoted to the community cat diversion coordinator position.  [Doc. 46 at 7].  The County also disputes the Plaintiff's claim that she never received the promotion, asserting that the Plaintiff was eventually assigned "additional duties as . . . 'Adoption/Rescue Coordinator.'"  [Doc. 63 at 3 n.1 (citing Doc. 61 at ¶ 8)].  The County alternatively argues that the Plaintiff fails to demonstrate that any tangible employment action was "taken for discriminatory reasons."  [Doc. 63 at 4 (citing Dulaney, 673 F.3d at 332)].  As such, the County argues that it cannot be held liable for Defendant Lockridge's conduct.  [Doc. 46 at 6 (citing Crockett, 717 F. 3d at 354)].

While the promotion may not have included an immediate increase in pay, a tangible employment action "may not always involve economic harm." Reinhold v. Com. of Va., 151 F.3d 172, 175 (4th Cir. 1998).  As such, even if the Court were to adopt the County's inference from the evidence, the Plaintiff's forecast is sufficient to show a tangible employment action regardless of whether the promotion would have included a pay increase.

Besides, it is undisputed that the promotion would have included the use of a county vehicle and provided an opportunity for future advancement in pay. [Doc. 61-27: Pl. First Dep. at 195-96]. The denial of those benefits constitutes an economic harm to the extent that one is required to show a tangible employment action. There is no forecast of evidence that the Plaintiff ever was promoted or ever received those benefits. [Id.]. Therefore, viewing that forecast of evidence in the light most favorable to the Plaintiff, a jury could conclude that the Plaintiff suffered a "tangible employment action." Ellerth, 524 U.S. at 761; Matvia v. Bald Head Island Mgmt., 259 F.3d 261, 271 (4th Cir. 2001).

The Plaintiff also presents a forecast of evidence from which a jury could reasonably conclude that the failure to promote her was due to discriminatory reasons. The Plaintiff consistently rebuffed Defendant Lockridge's inappropriate conduct by turning her head to avoid his attempts to kiss her, leaving meetings after he made inappropriate comments, and walking away after he touched her inappropriately. [Doc. 61-20 at 12, 122; Doc. 61-4: Lovelace Aff. at 2-3]. In one notable instance, Defendant Lockridge specifically asked the Plaintiff to apply for a position, helped her fill out her application for that position, and promised that she would receive that position before he made inappropriate sexual advances towards her.

[Doc. 61-27: Pl. First Dep. at 124-25, 192-93]. After the Plaintiff rebuffed those advances, however, she never received the position and never received an explanation for her failure to receive the position. [Id.]. Another employee at the Animal Control Department also states that Defendant Lockridge treated her differently after she rebuffed his sexual advances. [Doc. 61-1: Bracken Dep. at ¶ 5]. That forecast of evidence sufficiently establishes a nexus between the tangible employment action (the failure to promote the Plaintiff) and potential discriminatory reasons to survive a motion for summary judgment. Because the Plaintiff has presented a forecast of evidence from which a jury could reasonably conclude that she suffered a tangible employment action for discriminatory reasons, the County cannot invoke the Faragher-Ellerth affirmative defense to liability. See Crockett, 717 F.3d at 358. As such, the County Defendants' Motion for Summary Judgment will be denied with respect to the Plaintiff's Title VII claim against the County for hostile work environment.

### b. Unlawful Retaliation

Title VII makes it unlawful for an employer to retaliate against an employee "because [the employee] has opposed any practice made an unlawful practice by this subchapter," or "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). "In order to establish a *prima facie* case of retaliatory termination, a plaintiff must prove: (1) that she engaged in protected activity; (2) that the employer took adverse employment action against her; and (3) a causal connection existed between the protected activity and the adverse action." McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991). An "adverse action" occurs when "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

The Plaintiff's claims that she engaged in protected activities by reporting Defendant Lockridge's sexually hostile conduct, discriminatory compensation decisions, refusal to promote her, and threats regarding her husband's employment. [Doc. 1 at ¶ 85]. The Plaintiff claims that she suffered adverse employment action in the following ways: (1) the County failed to fully investigate the charges and rectify the situation; (2) Lovelace failed to immediately prepare and submit a report of the Plaintiff's complaints; (3) Mauney failed to make a written record of the investigation; (4) Wyant failed to determine whether the conduct constituted unlawful harassment within a reasonable time; (5) the County Manager failed to take immediate

and appropriate disciplinary action; (6) Wyant and Mauney failed to warn Lockridge not to retaliate against the person making the complaint; (7) Mauney never informed the Plaintiff of the results of the investigation on a timely basis; and (8) Wyant allowed Lockridge to retire instead of firing him. [Doc. 67-1 at 17-18].

The Plaintiff's bases much of her retaliation claim on the County's investigation of her sexual harassment complaint. Generally, the Plaintiff asserts that the County failed to take specific actions during the investigation and ultimately allowed Defendant Lockridge to retire with his benefits intact. For instance, the Plaintiff complains that the County did not investigate her claims fully, the County failed to take appropriate action against Defendant Lockridge, the County failed to instruct Defendant Lockridge not to retaliate against her, and the County failed to keep her informed about the investigation. [Id.].[7] Such allegations of inaction, however, are generally insufficient to suggest that a defendant engaged in adverse action against a plaintiff. See Robinson v. G.E. Aviation, No. 7:10–CV–00240–BR, 2012 WL 607559, at *2 (E.D.N.C. Feb. 24, 2012) (holding that "inaction" does not

---

[7] According to the forecast of evidence, the County took roughly two weeks to investigate the Plaintiff's claims (including multiple interviews with witnesses and Defendant Lockridge) before determining that Defendant Lockridge needed to be terminated. [Doc. 61-19: Wyant Dep. at 267; Doc. 61-13: Mauney Dep. at 267-91; Doc. 61-5: Lockridge Dep. at 298; Doc. 61-10].

amount to a Title VII retaliatory act). Even if those claims constitute an adverse action, there is no forecast of evidence from which a reasonable jury could determine that a causal connection existed between those alleged acts and the Plaintiff's complaints about Defendant Lockridge. McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991). Finally, it is worth noting that the Plaintiff chose to resign while the investigation was pending, and her voluntary resignation does not constitute an adverse employment action by the County. Cooper v. Smithfield Packing Co., Inc., 724 F. App'x 197, 202 (4th Cir. 2018) ("voluntary resignation is not an adverse employment action.") (citing Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 189 (4th Cir. 2004)). As such, the adverse employment actions alleged by the Plaintiff are simply insufficient to support a retaliation claim under Title VII. Accordingly, the Plaintiff's unlawful retaliation claim cannot survive the County's Motion for Summary Judgment.

### c. Direct Discrimination/Disparate Treatment

To make out a disparate treatment claim, "a plaintiff must show (1) she is a member of a protected class; (2) she was qualified for the job and performed it satisfactorily; (3) she suffered an adverse employment action; and (4) she was treated differently from similarly situated employees outside of the protected class." Anderson v. Duke Energy Corp., No. CIV.

26

3:06CV399, 2008 WL 4596238, at *12 (W.D.N.C. Oct. 14, 2008) (Reidinger, J.) (citing Sterling v. Tenet, 416 F.3d 338, 345 (4th Cir. 2005)). "An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (alteration and internal quotation marks omitted). Examples of an adverse action include a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." Id. (internal quotation marks omitted).

The County argues that the Plaintiff cannot produce evidence to support a disparate treatment claim because she cannot show that she suffered an adverse employment action or that she was treated "in a certain way" because she was a woman. [Doc. 46 at 14]. The County further argues that the Plaintiff is also barred from bringing a disparate treatment claim because she filed an EEOC Charge that asserted only "sex-based harassment by her 'supervisor,' not disparate treatment by the County." [Id. at 13].

The Plaintiff has presented a sufficient forecast of evidence from which a reasonable jury could conclude that she was a member of a protected class, she was qualified for her job and performed it satisfactorily, she suffered an adverse employment action when she was not promoted, and

she was treated differently from other similarly situated employees who were men. Specifically, the Plaintiff's forecast of evidence shows that Defendant Lockridge asked her to apply for a position, promised to give her that position if she applied, and made sexual advances toward her while she was filling out the application for that position. [Doc. 61-27: Pl. First Dep. at 124-25, 192-93]. After the Plaintiff rebuffed his advances, she never received the position that Defendant Lockridge had promised her. [Id.]. Bracken states that Defendant Lockridge also treated her differently after she rebuffed his sexual advances. [Doc. 61-1: Bracken Dep. at ¶ 5]. That forecast of evidence is sufficient to show that the Plaintiff suffered the loss of an "opportunity for promotion" and therefore suffered an adverse employment action. James, 368 F.3d at 375.

The Plaintiff's forecast of evidence also establishes that she was treated differently as a woman from similarly situated employees outside of the protected class. "An employee is harassed or otherwise discriminated against 'because of' his or her gender if, 'but for' the employee's gender, he or she would not have been the victim of the discrimination." Smith v. First Union Nat'l Bank, 202 F.3d 234, 242 (4th Cir. 2000). The Plaintiff's forecast of evidence shows that male employees were not subject to the same kind of mistreatment from Defendant Lockridge. [Doc. 61-25: Affidavit of Rita

Ross ("Ross Aff.") at 43].  As such, the Plaintiff's forecast of evidence establishes a claim for disparate treatment against the County.

The County, however, argues that the Plaintiff failed to exhaust her administrative remedies with regard to her disparate treatment claim.  [Doc. 46 at 13].  While the Plaintiff did not specifically state in her EEOC charge that she was bringing a disparate treatment claim against the County, the charge states that she was "sexually harassed" on a regular basis by her supervisor and that "two other female employees of this agency have also been harassed by the same supervisor."  [Doc. 1-1 at 1].  The charge further states that the Plaintiff believes that she has "been discriminated against because of my gender (female) in violation of Title VII of the Civil Rights Act of 1964."  [Id].  The Plaintiff alleged disparate treatment; the County Defendants were on notice that the Plaintiff was alleging disparate treatment; the EEOC investigated claims related to disparate treatment; and conciliation would have been pursued only for practices related to disparate treatment. As such, the Plaintiff's disparate treatment claim against the County falls within the ambit of "'charges that would naturally have arisen from an investigation'" of the charges included in her EEOC charge, namely that she was sexually harassed by her supervisor, that other females also were similarly harassed, and that she had to quit her job to escape the

29

harassment.  Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 408 (4th Cir. 2013) (citing Chacko v. Patuxent Inst., 429 F.3d 505, 506 (4th Cir. 2005)).  Accordingly, the Plaintiff exhausted her administrative remedies with regard to her Title VII claim of disparate treatment against the County.

For all these reasons, the County Defendants' Motion for Summary Judgment will be granted as to the Title VII claim for unlawful retaliation against the County.  The County Defendants' Motion for Summary Judgment will be denied with regard to the claims for hostile work environment and disparate treatment.

## B.    Equal Pay Act Claims

The Plaintiff makes claims under the Equal Pay Act of 1963, 29 U.S.C. § 206(d) and the Lilly Ledbetter Fair Pay Act of 2009.  [Doc. 1 at 33].  In her response to the County Defendants' Motion for Summary Judgment, however, the Plaintiff states that she "does not oppose dismissal of [her] Second Cause of Action," referring to these claims.  [Doc. 67-1 at 2].  As such, the Plaintiff's claims under the Equal Pay Act and the Lilly Ledbetter Fair Pay Act will be dismissed.

## C.    § 1983 Claims

The Plaintiff also brings claims under 42 U.S.C. § 1983 against the County Defendants for "violation of rights protected by federal law, including

30

the First, Fourth, Fifth, and Fourteenth Amendments of the United States Constitution." [Doc. 1 at ¶¶ 109-23]. The Plaintiff claims that the County is liable for the following actions taken by Defendants Epley, Lockridge, and Wyant under the color of state law: (1) allowing the creation of a sexually hostile work environment; (2) selectively enforcing laws and abusing authority to appoint animal control officers; (3) failing to provide adequate hiring, training and/or supervision; (4) failing to provide a safe work environment free of sexual harassment and sexual hostility; (5) being recklessly indifferent as to whether such wrongful conduct occurred; (6) failing to take actions required or available after having actual or constructive knowledge of unlawful activities and a hostile work environment; (7) failing to adequately supervise and control an employee who was allegedly a "known sexual predator"; and (8) failing to adopt and enforce adequate policies and procedures for policing and monitoring a workplace free of sexual hostility. [Doc. 1 at ¶ 115]. The Plaintiff further claims that those actions were "pursuant to a policy, custom, practice and/or procedure of the Cleveland County Animal Control Department." [Id. ¶ 120].[8]

_____

[8] The Plaintiff further claims that the County can be held liable under § 1983 for failing to train its employees. [Id. (citing Spell v. McDaniel, 824 F.2d 1380, 1398 (4th Cir. 1987))]. The Plaintiff's forecast of evidence, however, does not support the claim that the County failed to train its employees. See City of Canton v. Harris, 489 U.S. 378, 387 (1989) ("[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983.").

The County Defendants request judgment on the pleadings under Rule 12(c), arguing that the Plaintiff's Complaint "fails to allege that any official policy or custom" violated her constitutional or statutory rights. [Doc. 46 at 16].

### 1. Official Capacity Claims

To begin, the Court addresses the Plaintiff's § 1983 claims against Defendants Epley and Wyant in their official capacities. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) (citing Brandon v. Holt, 469 U.S. 464, 471 (1985); Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690 (1978) (official capacity claims "represent only another way of pleading an action against an entity of which an officer is an agent"). Accordingly, the Court will grant the County Defendants' Motion for Summary Judgment on the claims against Defendants Epley and Wyant in their official capacities because the Plaintiff's § 1983 claim against the County makes those claims redundant. Ramsey v. Schauble, 141 F. Supp.2d 584, 591 (W.D.N.C. 2001). As such, the sole remaining § 1983 claims for the purposes of the County Defendants' Motion for Summary Judgment are the claims against the County and Wyant in her individual capacity.

## 2.    <u>Monell</u> Claim Against the County

The Court turns next to the Plaintiff's § 1983 claim against the County.[9]

"Under <u>Monell</u>, municipalities are not liable pursuant to *respondeat superior* principles for all constitutional violations of their employees simply because of the employment relationship."   <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 244 (4th Cir. 1999) (citing <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690-92 (1978)).   "Instead, municipal liability results only 'when execution of a government's policy or custom, whether made by its law makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'"   <u>Id.</u>   A local government manifests a "policy or custom" in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a

---

[9] The "elements of prima facie case are the same under Title VII and § 1983."  <u>Church v. Maryland</u>, 53 F. App'x 673, 675 (4th Cir. 2002) (citing <u>Gairola v. Virginia Dep't of Gen. Servs.</u>, 753 F.2d 1281, 1285 (4th Cir. 1985).  There are, however, key differences between Title VII and § 1983 claims.  For instance, Title VII has a damages cap and § 1983 does not. <u>Compare</u> 42 U.S.C. § 1981a, <u>with</u> 42 U.S.C. § 1983; <u>see also</u> <u>Kleppinger v. Tex. Dep't of Transportation</u>, No. CV L-10-124, 2012 WL 12893653, at *7 (S.D. Tex. Aug. 10, 2012) ("Courts have concluded that Congress has not seen fit to impose any recovery caps in cases under § 1983.") (citation omitted).  As such, while Title VII and § 1983 claims have the same liability standard, they are not duplicative claims.  <u>Dwyer v. Smith</u>, 867 F.2d 184 (4th Cir. 1989).

"custom or usage with the force of law." Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)).

If a plaintiff claims that a practice is so persistent and widespread that it constitutes a custom or usage, then that plaintiff must show that "its continued existence can be laid to the fault of municipal policymakers, and a sufficient causal connection between the 'municipal custom and usage' and the specific violation can then be established." Spell, 824 F.2d at 1390. "Municipal fault for allowing such a developed 'custom or usage' to continue requires (1) actual or constructive knowledge of its existence by responsible policymakers, and (2) their failure, as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices." Id. at 1391. "Actual knowledge may be evidenced by recorded reports to or discussions by a municipal governing body." Id. at 1387 "Constructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." Id.

There is nothing in the Plaintiff's forecast of evidence to show that Defendant Wyant or Defendant Epley[10] had actual knowledge of Defendant

---

[10] The Plaintiff identifies Defendants Wyant and Epley as the County policymakers who had actual or constructive knowledge of Defendant Lockridge's harassment. [Doc. 1 at ¶¶ 120-21].

Lockridge's inappropriate behaviors. There is no evidence that Defendant Wyant, Defendant Epley, or any other policymaker received a report of Defendant Lockridge's behavior, and nothing indicates that they ever discussed Defendant Lockridge's behavior. Id. As such, there is no forecast of evidence from which a reasonable jury could conclude that policymakers had actual knowledge of Defendant Lockridge's behavior. Accordingly, the Plaintiff's theory of liability under Monell relies on Defendant Wyant or Defendant Epley having had constructive knowledge of Defendant Lockridge's behavior.

The Plaintiff's forecast of evidence, however, falls short of establishing that Defendant Wyant or Defendant Epley had constructive knowledge of Defendant Lockridge's harassment. The County had a policy that encouraged employees to report sexual harassment, [Doc. 61-19: Wyant Dep. at 183-86, 253], and it is undisputed that no employee complained about Defendant Lockridge's conduct between when he was disciplined in 1994 and when the Plaintiff complained in 2017. [Id. at 190; Doc. 61-4: Lovelace Aff. at ¶¶ 15-17; Doc. 61-28: Pl. Second Dep. at 428-29]. While parts of the Plaintiff's forecast of evidence suggest that Defendant Wyant witnessed some of Defendant Lockridge's behavior, the behavior that Defendant Wyant purportedly witnessed would not have given her

35

constructive knowledge that Defendant Lockridge was harassing his subordinates. For instance, while Defendant Wyant admits that she saw Defendant Lockridge hug four employees, she states that those employees did not appear offended by Defendant Lockridge's hugs. [Doc. 61-19: Wyant Dep. at 249-250]. Indeed, no employee ever complained about Defendant Lockridge's hugs, and at least one of Defendant Lockridge's subordinates did not believe that his hugs were improper. [Id. at 190; Doc. 61-24: Ross Aff. at 25-28]. Moreover, while Defendant Lockridge hugged Defendant Wyant at work, she also did not believe that his hugs were improper and was not offended by his hugs. [Doc. 61-19: Wyant Dep. at 233]. The Plaintiff presents no evidence from which a reasonable jury could conclude that Defendant Wyant witnessed Defendant Lockridge's more extreme behaviors, like making inappropriate sexual comments, inappropriately touching employees, or asking employees to kiss him.

The Plaintiff places significance on the fact that Defendant Lockridge was previously disciplined for inappropriate behavior with a female subordinate. According to the Plaintiff, that prior discipline gave Defendants Epley and Wyant reason to know about Defendant Lockridge's behavior despite the lack of complaints against him. The discipline against Defendant Lockridge, however, occurred in 1994, sixteen years before Defendant

Wyant began supervising Defendant Lockridge and twenty-three years before the actions at issue in this case. [Doc. 61-19: Wyant Dep. at 279]. Moreover, a § 1983 claim cannot be shown solely by an employer's decision to retain an employee who was previously disciplined for similar conduct. Jones v. Wellham, 104 F.3d 620, 626 (4th Cir. 1997).

Much of the Plaintiff's remaining forecast of evidence relates to the "close personal ties" between Defendant Wyant and Defendant Lockridge. [Doc. 67-1 at 4]. According to the Plaintiff's apparent theory, Defendant Wyant was so close to Defendant Lockridge that she must have known about his harassment. The Plaintiff's theory would impose strict liability for municipalities under § 1983 whenever a supervisor has a close personal relationship with an employee who harasses a subordinate. Neither § 1983 nor the cases following Monell impose such a standard. Moreover, while the Plaintiff's forecast of evidence shows that Defendant Lockridge was close to Defendant Wyant outside of work, the Plaintiff's forecast fails to show that Defendant Wyant worked in close proximity to Defendant Lockridge, where she would have had an opportunity to observe his behavior. The undisputed evidence is that while Defendant Wyant and Defendant Lockridge met regularly, they worked in different buildings. [Doc. 61-19: Wyant Dep. at 123-24].

Finally, the practices here were not so widespread or flagrant that Defendant Wyant and Defendant Epley should have known about them as policymakers.  Spell, 824 F.2d at 1387.  "'The word 'widespread' must be taken seriously. It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once.'"  Gaddy v. Yelton, No. 1:10-cv-00214, 2011 WL 3608023, at *5 (W.D.N.C. Aug. 16, 2011) (Reidinger, J.) (quoting Phelan v. Cook Cty., 463 F.3d 773, 790 (7th Cir. 2006), overruled on other grounds by Ortiz v. Werner Enterprises, Inc., 834 F.3d 760 (7th Cir. 2016)).  It is not reasonable to infer that any practice is so "widespread" as to give notice to policymakers where that practice is limited to one employee at a location away from those policymakers.  Instead, the Plaintiff must show that "the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision."  Id.

While the Plaintiff's forecast of evidence shows that Lockridge regularly harassed the Plaintiff until she complained, such behavior was not reported and was not so pervasive that Defendants Wyant and Epley should have been aware of it.  Indeed, once the harassment was reported, the forecast of evidence shows that Defendant Wyant immediately started an investigation, quickly determined that Defendant Lockridge needed to be

terminated, and took steps to effectuate that termination. Based on that forecast of evidence, no reasonable jury could find that Defendant Wyant had actual or constructive knowledge of Defendant Lockridge's harassment such that municipal liability could be imposed under § 1983. <u>Spell</u>, 824 F.2d at 1390. Accordingly, the County Defendant's Motion for Summary Judgment will be granted as to the § 1983 claims against the County.

### 3. Individual Claim Against Defendant Wyant

The Court next addresses the Plaintiff's § 1983 claim against Defendant Wyant in her individual capacity. "It is well settled that 'supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates.'" <u>Baynard v. Malone</u>, 268 F.3d 228, 235 (4th Cir. 2001) (quoting <u>Shaw v. Stroud</u>, 13 F.3d 791, 798 (4th Cir. 1994)). To state a claim for supervisory liability under § 1983, a plaintiff must demonstrate that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices;" (3) there was an "affirmative causal link" between the

39

supervisor's inaction and the constitutional injury the plaintiff suffered. <u>Shaw</u>, 13 F.3d at 799.

As discussed above, the Plaintiff's forecast of evidence is insufficient for a reasonable jury to find that Defendant Wyant had actual or constructive knowledge of Defendant Lockridge's behavior and failed to stop or correct the practice. As such, Defendant Wyant cannot be held liable for Defendant Lockridge's conduct as his supervisor. <u>Shaw</u>, 13 F.3d at 799; <u>Spell</u>, 824 F.2d at 1390. Accordingly, the County Defendant's Motion for Summary Judgment will be granted as to the § 1983 claims against Defendant Wyant in her individual capacity.

### D.  § 1985 Claims

The Plaintiff brings claims against the County Defendants for violations of § 1985. [Doc. 1 at ¶¶ 124-30]. The County Defendants move for summary judgment on the Plaintiff's § 1985 claims. [Doc. 45 at 4].

The law is well-settled that to establish a sufficient cause of action for "conspiracy to deny equal protection of the laws" under section 1985(3), a plaintiff must prove: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt

act committed by the defendants in connection with the conspiracy. Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995) (citing Buschi v. Kirven, 775 F.2d 1240, 1257 (4th Cir. 1985)). The Fourth Circuit, "has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy, such that the claim can withstand a summary judgment motion." Id. Specifically, the Fourth Circuit has "specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." Id.

Here, the Plaintiff claims that Defendant Lockridge and Defendant Wyant "agreed . . . to violate the law" and did so "presumably with the consent of and/or in collaboration with Defendants Greer and Eppley [sic]." [Doc. 1 at ¶ 128].[11] While the Plaintiff argues that "[t]he evidence discloses an unlawful agreement between the individual Defendants[,]" she does not cite to any particular pieces of evidence to support that claim. [Doc. 67-1 at 22]. The Plaintiff's conclusory allegations regarding a conspiracy are plainly insufficient to show the concrete supporting facts necessary to establish a conspiracy under § 1985. See Simmons, 47 F.3d at 1376. As such, the

---

[11] While the Plaintiff mentions an individual by the name of "Greer" two other times in her Complaint, she did not bring any claims against "Greer." [Doc. 1 at ¶¶ 125, 141].

County Defendants' Motion for Summary Judgment on the Plaintiff's § 1985 claim will be granted.

### E.     NCWHA Claims

The Plaintiff brings claims for violations of the NCWHA.  [Doc. 1 at ¶¶ 131-138].  The County Defendants respond that they cannot be held liable for the Plaintiff's NCWHA claims because the County is statutorily exempt from the NCWHA and Defendants Wyant and Epley do not qualify as employers.  [Doc. 46 at 20].

The Plaintiff cannot bring her NCWHA claim against the County because the NCWHA expressly exempts the County from its coverage except in narrow exceptions that do not apply here.  N.C. Gen. Stat § 95-25.14(d).  The Plaintiff argues that the County can be held liable under the NCWHA because it breached an employment contract with the Plaintiff. [Doc. 67-1 at 23].  The Plaintiff cites no authority for this novel proposition. The County is statutorily exempt from the Plaintiff's NCWHA claim regardless of whether it committed a breach of contract.  A county's ability to be held liable for a common-law breach of contract claim is completely irrelevant to the Plaintiff's statutory action under the NCWHA.  Accordingly, the County's Motion for Summary Judgment on the Plaintiff's NCWHA claim against it will be granted.

With regard to the Plaintiff's NCWHA claims against Defendants Wyant and Epley in their official capacities and Defendant Wyant in her individual capacity, the NCWHA only applies to "employers." N.C. Gen. Stat. § 95-25.6; Kinsinger v. Good, No. 317CV00643FDWDCK, 2019 WL 1028017, at *2 (W.D.N.C. Mar. 4, 2019). North Carolina law defines "employer" for purposes of the NCWHA as: "any person acting directly or indirectly in the interest of an employer in relation to any employee." N.C. Gen. Stat. § 95-25.2. "[W]hile employees or managers can be individually liable under the [NCWHA] for a failure to pay wages, their individual liability is contingent upon them acting as an 'employer.'" Kinsinger, 2019 WL 1028017, at *2 (citing Powell v. P2Enterprises, LLC, 786 S.E.2d 798, 801 (N.C. Ct. App. 2016). The question of whether an individual is an "employer" turns on "the totality of the circumstances to determine whether the individual has sufficient operational control over the workers in question and the allegedly violative actions to be held liable for unpaid wages or other damages." Powell, 786 S.E.2d at 801.

The Plaintiff's employer was the County. The Plaintiff presents no forecast of evidence from which either Defendant Epley or Defendant Wyant could be considered her employer. As such, the County Defendants' Motion for Summary Judgment on the Plaintiff's NCWHA claims against Defendants

Wyant and Epley in their official capacities and Defendant Wyant in her individual capacity will be granted.

### F. Negligent Hiring, Training, Supervision, and Retention and Negligent Infliction of Emotional Distress Claims

The Plaintiff brings state-law claims against the County Defendants for negligent hiring, training, supervision, and retention and negligent infliction of emotional distress. [Doc. 1 at ¶¶ 139-44, 146-49]. The County claims that it is entitled to governmental immunity and Defendants Epley and Wyant claim that they are entitled to public official immunity on those claims. [Doc. 46 at 21-22].

First, with regard to the claims against the County, "[u]nder the doctrine of governmental immunity, a county is immune from suit for the negligence of its employees in the exercise of governmental functions absent waiver of immunity." Meyer v. Walls, 347 N.C. 97, 104, 489 S.E.2d 880, 884 (1997) (citing State ex rel. Hayes v. Billings, 240 N.C. 78, 80, 81 S.E.2d 150, 152 (1954)). "A county may waive its immunity by purchasing liability insurance covering a particular risk." Ballard v. Shelley, 257 N.C. App. 561, 565, 811 S.E.2d 603, 606 (2018) (citing N.C. Gen. Stat. § 153A-435(a)). If the liability policy, by its plain terms, does not provide coverage for the alleged acts, then the policy does not waive governmental immunity. Id. As such, while governmental immunity for particular claims may be waived by the purchase

44

of liability insurance, but the purchase of general excess liability insurance does not waive governmental immunity. Id.; see also Hinson v. City of Greensboro, 232 N.C. App. 204, 210, 753 S.E.2d 822, 827 (2014) ("if a County is immune from [certain] claims . . . it will never have a legal obligation to pay [on those claims] and, thus, has not waived its immunity through the purchase of [an] excess liability insurance policy.").

According to an affidavit submitted by the Deputy County Attorney for Cleveland County, the only insurance held by the County that would be applicable to the Plaintiff's state-law claims is its excess liability insurance. [Doc. 46-3]. Cleveland County does not have any other insurance that covers the Plaintiff's claims. [Id.]. As such, the County has not waived its governmental immunity from suit for those claims. Accordingly, the County Defendants' Motion for Summary Judgment on the Plaintiff's claims for negligent hiring, training, supervision, and retention and negligent infliction of emotional distress against the County will be granted.

The Court turns next to the Plaintiff's negligent hiring, training, supervision, and retention and negligent infliction of emotional distress claims against Defendant Wyant and Defendant Epley in their official capacities. Lawsuits against a government employee in his or her official capacity "generally represent only another way of pleading an action against

an entity of which the officer is an agent." <u>Kentucky v. Graham</u>, 473 U.S. 159, 165–66 (1985) (quotation omitted). "Thus, a suit against an official in his or her official capacity should be treated as a suit against the entity." <u>Bryant v. Locklear</u>, 947 F. Supp. 915, 916 (E.D.N.C. 1996) (citing <u>Graham</u>, 473 U.S. at 166). Because the Plaintiff cannot bring her negligence claims against the County due to governmental immunity, the Plaintiff also cannot bring her claims against Defendants Wyant or Epley in their official capacities. As such, the County Defendants' Motion for Summary Judgment on the Plaintiff's negligent hiring, training, supervision, and retention and negligent infliction of emotional distress claims against Defendants Epley and Wyant in their official capacities will be granted.

Finally, the Court turns to the Plaintiff's negligent hiring, training, supervision, and retention and negligent infliction of emotional distress claims against Defendant Wyant in her individual capacity. The North Carolina Supreme Court has said that

> [i]t is settled law in this jurisdiction that a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto. The rule in such cases is that an official may not be held liable unless it be alleged and proved that his act, or failure to act, was corrupt or malicious . . . or that he acted outside of and beyond the scope of his duties.

Smith v. Hefner, 235 N.C. 1, 7, 68 S.E.2d 783, 787 (1952). The North Carolina Court of Appeals has held that a "County Health Director is a 'public official' created by statute." Satorre v. New Hanover Cty. Bd. of Comm'rs, 165 N.C. App. 173, 179, 598 S.E.2d 142, 146 (2004).

Defendant Wyant served as the Health Director of the Cleveland County Health Department. [Doc. 61-19: Wyant Dep. at 55]. As such, Defendant Wyant was a public official who cannot be held individually liable for negligence unless her actions were "corrupt, malicious or perpetrated outside and beyond the scope of official duties." Trantham v. Lane, 127 N.C. App. 304, 306–07, 488 S.E.2d 625, 627 (1997) (citing Locus v. Fayetteville State University, 102 N.C. App. 522, 526, 402 S.E.2d 862, 865 (1991)). The Plaintiff presents no forecast of evidence from which a reasonable jury could conclude that Defendant Wyant acted corruptly, maliciously, or outside of the scope of her duties. Accordingly, the County Defendants' Motion for Summary Judgment on the Plaintiff's claims for negligent hiring, training, supervision, and retention and negligent infliction of emotional distress against Defendant Wyant in her individual capacity will be granted.

## G. Intentional Infliction of Emotional Distress Claims

The Plaintiff also brings claims for intentional infliction of emotional distress against the County Defendants. [Doc. 1 at ¶¶ 145-54]. The County

again claims that it is entitled to governmental immunity and Defendants Epley and Wyant again claim that they are entitled to public official immunity on the Plaintiff's claim. [Doc. 46 at 22].

As discussed above, the County retains its governmental immunity against the Plaintiff's claim for intentional infliction of emotional distress because it has only purchased excess liability insurance, which does not waive governmental immunity. Ballard v. Shelley, 257 N.C. App. 561, 565, 811 S.E.2d 603, 606 (2018). Accordingly, the County Defendants' Motion for Summary Judgment on the Plaintiff's intentional infliction of emotional distress claim against the County will be granted.

With regard to the intentional infliction of emotional distress claims against Defendants Epley and Wyant in their official capacities and Defendant Wyant in her individual capacity, "[p]ublic official immunity is not a defense to intentional torts." Mandsager v. Univ. of N.C. at Greensboro, 269 F.Supp.2d 662, 681 (M.D.N.C. 2003); Beck, 154 N.C. App. at 230, 573 S.E.2d at 190. Nevertheless, "[i]t is well settled that absent evidence to the contrary, it will always be presumed 'that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law.'" Leete v. Cty. of Warren, 341 N.C. 116, 119, 462 S.E.2d 476, 478 (1995) (quoting Huntley v. Potter, 255 N.C. 619, 628, 122 S.E.2d

681, 686–87 (1961)). "This presumption places a heavy burden on the party challenging the validity of public officials' actions to overcome this presumption by competent and substantial evidence." Id. "Evidence offered to meet or rebut the presumption of good faith must be sufficient by virtue of its reasonableness, not by mere supposition." Dobson v. Harris, 352 N.C. 77, 85, 530 S.E.2d 829, 836 (2000). "If plaintiff's forecast of evidence of malice is not sufficient to permit reasonable minds to conclude that the . . . presumed good faith was nonexistent, then summary judgment for defendant is proper." Id. (internal quotations omitted).

The Plaintiff has not presented a forecast of evidence from which a reasonable jury could find that Defendant Epley or Defendant Wyant failed to act in good faith. As discussed, the Plaintiff's evidence is insufficient to show that Defendant Epley or Wyant had actual or constructive knowledge of Defendant Lockridge's harassment. When Defendant Wyant became aware of the harassment, she acted to stop it. The Plaintiff's forecast of evidence is simply insufficient to permit reasonable minds to overcome the presumption of good faith. Id. Accordingly, the County Defendants' Motion for Summary Judgment on the Plaintiff's intentional infliction of emotional distress claim against Defendants Epley and Wyant in their official capacities and against Defendant Wyant in her individual capacity will be granted.

49

## H.   Wrongful Discharge Claims

The Plaintiff brings claims against the County Defendants for wrongful discharge.  [Doc. 1 at ¶ 155-63].  The County Defendants respond that they are entitled to summary judgment because the Plaintiff resigned.  [Doc. 46 at 23].  The County Defendants further claim that they are immune from the Plaintiff's wrongful discharge claims under governmental and public official immunity.  [Id.].

The Plaintiff resigned from her employment with the County.  [Doc. 1 at ¶ 39; Doc. 61-27: Pl. First Dep. at 31].  North Carolina law does not allow a plaintiff to bring a tort claim for wrongful discharge if the plaintiff resigned or claims to have been constructively discharged.  Creech v. City of Wilson, No. 5:19-CV-70-FL, 2019 WL 3720744, at *3 (E.D.N.C. Aug. 7, 2019); Gravitte v. Mitsubishi Semiconductor Am., Inc., 109 N.C. App. 466, 472, 428 S.E.2d 254, 258 (1993).  Because the Plaintiff resigned, she cannot bring a claim for wrongful discharge under North Carolina law.  Accordingly, the County Defendants' Motion for Summary Judgment on the Plaintiff's claim for wrongful discharge will be granted.

## I.   Loss of Consortium Claims

The Plaintiff brings claims for loss of consortium against the County Defendants.  [Doc. 1 at ¶¶ 164-67].  The County Defendants respond that

they are entitled to summary judgment because the Plaintiff's husband has dismissed his claims against them. [Doc. 46 at 23-24]. The County Defendants further claim that they are immune from the Plaintiff's loss of consortium claims under governmental and public official immunity. [Id.].

This action was originally filed by the Plaintiff and her husband, Brian Willis. [Doc. 1]. On August 15, 2019, however, a stipulation of dismissal without prejudice was entered on behalf of Brian Willis. [Doc. 26]. As such, Brian Willis is no longer a party to this case and no longer has any claims against the County Defendants. The North Carolina Supreme Court has held that "[a] spouse may maintain a cause of action for loss of consortium due to the negligent actions of third parties so long as that action for loss of consortium is joined with any suit the other spouse may have instituted to recover for his or her personal injuries." Nicholson v. Hugh Chatham Mem'l Hosp., Inc., 300 N.C. 295, 304, 266 S.E.2d 818, 823 (1980). A wife, however, cannot maintain a loss of consortium claim if her husband has been dismissed from the suit. Snoznik v. Jeld-Wen, Inc., No. CIV.1:09CV42, 2010 WL 1924483, at *27 (W.D.N.C. May 12, 2010) (Reidinger, J.) ("Because Mrs. Snoznik's claim for loss of consortium is dependent upon the survival of the underlying claims asserted by Mr. Snoznik against the Defendant, the dismissal of Mr. Snoznik's . . . claims necessitates the dismissal of Mrs.

51

Snoznik's loss of consortium claim as well.") (citations omitted). Because the Plaintiff's husband has voluntarily dismissed his claims against the County Defendants, the Plaintiff cannot maintain a loss of consortium claim against them. Accordingly, the County Defendants' Motion for Summary Judgment on the Plaintiff's loss of consortium claims will be granted.

### J. Punitive Damages Claims

The Plaintiff brings punitive damages claims against the County Defendants. [Doc. 1 at ¶¶ 168-73]. The County responds that it is entitled to summary judgment because punitive damages are not enforceable against the County. [Doc. 46 at 24].

With regard to the punitive damages claim against the County, the North Carolina Supreme Court has held that "in the absence of statutory provisions to the contrary, municipal corporations are immune from punitive damages." Long v. City of Charlotte, 306 N.C. 187, 208 (1982). As such, "[m]unicipalities may not be held liable for punitive damages, whether under 42 U.S.C. § 1983 or North Carolina law." Iglesias v. Wolford, 539 F. Supp. 2d 831, 841 (E.D.N.C. 2008); see also Hogan v. Cherokee Cty., No. 1:18 CV 96, 2019 WL 2591089, at *12 (W.D.N.C. Feb. 28, 2019), report and recommendation adopted, No. 1:18-CV-00096-MR-WCM, 2019 WL 1376074 (W.D.N.C. Mar. 27, 2019). Likewise, "a plaintiff is not entitled to

recover punitive damages against a government, government agency, or political subdivision in an action brought under Title VII." Efird v. Riley, 342 F.Supp.2d 413, 430 (M.D.N.C. 2004). Accordingly, the County Defendants' Motion for Summary Judgment as to the Plaintiff's punitive damages claim against the County will be granted.

With regard to the punitive damages claims against Defendant Epley in his official capacity and Defendant Wyant in her official and individual capacities, public officers can be held liable for punitive damages under state law only "if the claimant proves that the defendant is liable for compensatory damages" and also proves fraud, malice, or willful or wanton conduct by clear and convincing evidence. N.C. Gen. Stat. § 1D–15. Because the Plaintiff's claims against Defendants Epley and Wyant will be dismissed, there is no basis for holding Defendants Epley and Wyant liable for punitive damages. Accordingly, the County Defendants' Motion for Summary Judgment as to the Plaintiff's punitive damages claim against Defendant Epley in his official capacity and Defendant Wyant in her official and individual capacities will be granted.

## K. Declaratory Relief

The Plaintiff also requests declaratory relief in the form of "a declaration of rights, status, or other legal relations with respect to their

liberty, property, statutory and constitutional rights, privileges, immunities, and authorities, as to each party hereto[.]" [Doc. 1 at ¶ 177]. A district court, in its discretion, may decline to entertain a declaratory judgment claim for "good reason." Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d 581, 594 (4th Cir.2004). Courts have used that discretion to decline to adjudicate declaratory judgment actions that are duplicative of other claims in the same case. See e.g., Laera v. Rosenbaum, No. 3:15-CV-371-RJC-DCK, 2016 WL 6775638, at *5 (W.D.N.C. Nov. 15, 2016); Federal Nat'l Mortg. Ass'n v. K.O. Realty, Inc., No. 3:13-CV-2781-L, 2014 WL 3900619, at *8 (N.D. Tex. 2014); Takeda Pharm. Co. v. Mylan Inc., 62 F. Supp. 3d 1115, 1122 (N.D. Cal. 2014).

The Plaintiff's request for a declaratory judgment appears to be based on the same allegations as the other claims in the Complaint. In that regard, the Plaintiff's request for a declaratory judgment is duplicative of the Plaintiff's other claims. Diamond Falls Estates, LLC v. Nantahala Bank & Tr. Co., No. 2:14-CV-00007-MR-DLH, 2015 WL 5233010, at *17 (W.D.N.C. Sept. 8, 2015) (Reidinger, J.) ("a declaratory judgment claim . . . based on the same allegations . . . is simply duplicative of the Plaintiffs' other causes of action."). As such, the Court will utilize its discretion to decline to consider the Plaintiff's duplicative request for declaratory judgment. Accordingly, the

County Defendants' Motion for Summary Judgment will be granted with regard to the Plaintiff's request for declaratory relief.

## V. CONCLUSION

For all these reasons, the County Defendants' Motion for Summary Judgment will be granted in part and denied in part as follows. The County Defendants' Motion will be granted on the Plaintiff's (1) Title VII claims for unlawful retaliation against Defendant Epley in his official capacity, Defendant Wyant in her official and individual capacities, and the County; (2) Equal Pay Act and Lilly Ledbetter Fair Pay Act claims against all of the County Defendants; (3) Section 1983 claims against all of the County Defendants; (5) NCWHA claims against all of the County Defendants; (6) negligent hiring, training, supervision, and retention and negligent infliction of emotional distress claims against all of the County Defendants; (7) intentional infliction of emotional distress claims against all of the County Defendants; (8) wrongful discharge claims against all of the County Defendants; (9) loss of consortium claims against all of the County Defendants; (10) punitive damages claims against all of the County Defendants; and (11) request for declaratory relief. The Motion for Summary Judgment will be denied with respect to the Plaintiff's Title VII claims for hostile work environment and disparate treatment against the County.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the County Defendants' Motion for Summary Judgment [Doc. 45] is hereby **GRANTED IN PART** and **DENIED IN PART** as follows:

(1)   The Motion is **DENIED** with respect to the Plaintiff's Title VII claims for hostile work environment and disparate treatment against the County;

(2)   The Motion is **GRANTED** with respect to all of the Plaintiff's other claims against the County, Defendant Epley in his official capacity, and Defendant Wyant in her official and individual capacities.  Those claims are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

Signed: July 1, 2020

Martin Reidinger
Chief United States District Judge